IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TURNER ANTHONY BURNETT,              *

    Plaintiff,                       *

v.                                   *   Civil Action No. GLR-16-510

FRANK B. BISHOP, et al.,             *

    Defendants.                      *

## MEMORANDUM OPINION

THIS MATTER is before the Court on two Motions to Dismiss or, in the alternative, for Summary Judgment: one filed by Defendant Frank Bishop (ECF No. 14) and the other by Defendants Dr. Collin Ottey, Dr. Mahboob Ashraf,[1] William Beeman, Brenda Reese, Travis Barnhart, and Wexford Health Services[2] (ECF No. 15). Also pending is Plaintiff Turner Anthony Burnett's unopposed Motion Requesting Leave to File an Amended Complaint (ECF No. 12). The Motions are ripe for disposition and no hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will grant the Motions.

## I.   BACKGROUND

At all times relevant to his allegations, Burnett was an inmate incarcerated at the North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. (Am. Compl. ¶ 1 at 3,3 ECF No. 12 at 2–

---

[1] The Court will direct the Clerk to update the case caption by correcting the spelling of this Defendant's name from "Mahboob Ashrap" to "Mahboob Ashraf."

[2] The Court will refer to these Defendants collectively as "Wexford."

[3] In his Amended Complaint, Burnett repeats paragraph numbers

13).  Bishop is NBCI's Warden and Wexford Health contracts with NBCI
to provide medical services for NBCI's inmates.  (Id. ¶¶ 2, 8 at 3,
4).  The remaining Defendants are Wexford employees.  (Id. ¶¶ 3-7 at
3, 4).

Burnett presents three challenges to Defendants' conduct.
First, he asserts that Defendants failed to ensure that inmate nail
clippers were properly disinfected.  At one point, NBCI medical
personnel were responsible for disinfecting nail clippers and
distributing them to inmates.  (Id. ¶ 4 at 6).  Defendants, however,
"made a conscious decision" to transfer these responsibilities to
corrections officers.  (Id. ¶¶ 2, 5 at 6).  Burnett alleges that
"none of the [corrections] officers were trained as to the legal
requirements of properly cleaning and disinfecting . . . the nail
clippers in hot soapy water[], [rinsing them], and plac[ing] [them]
in Barbicide after each use for ten (10) minutes as stated in
federal guidelines."[4]  (Id. ¶ 6 at 6).  Defendants also permitted
the corrections officers to ignore "Barbicide['s] directions for
use" and "[i]nformation and warnings by the National Hepatitis
Correctional Network" by placing "contaminated" nail clippers "into
the same bowl."  (Id. ¶¶ 7, 8 at 7).  Burnett asserts that in April
2015, he contracted the Hepatitis C virus ("HCV") when he cut

---

one through eight for what would be paragraphs nine through sixteen.
To avoid confusion, when citing paragraph numbers one through
eight, the Court will also include the page number on which the
allegations appear.
    [4] Burnett does not cite the "federal guidelines" he references.

2

himself with a pair of contaminated nail clippers that were improperly disinfected. (Id. ¶¶ 9, 17).

Second, Burnett alleges Wexford failed to provide adequate medical care after Burnett was diagnosed with HCV. He acknowledges that Barnhart, who works in NBCI's infectious disease department, "spoke candidly and in depth" with Burnett about how NBCI medical personnel would treat his HCV. (Id. ¶ 19). Burnett also concedes that Dr. Ashraf and Barnhart explained that he did not have the correct genotype of HCV for the prescription drug Harvoni to be effective. (Id. ¶ 23). Nonetheless, Burnett asserts that Wexford "withheld obvious medical treatment" when it refused to prescribe Harvoni. (Id. at 11).[5]

Third, Burnett asserts that Defendants ignored a longstanding order of the Maryland Department of Public Safety and Correctional Services ("DPSCS") that corrections facilities in Maryland conduct annual tuberculin skin tests on inmates. (Id. at 5).[6] Burnett, however, does not allege that he was exposed to or contracted tuberculosis.

In February 2016, Burnett, acting pro se, sued Defendants under 42 U.S.C. § 1983 (2012). (ECF No. 1). Burnett alleges that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishments. (Id.). Burnett seeks declaratory relief

---

[5] Burnett does not assign a paragraph number to this allegation.
[6] Burnett does not assign a paragraph number to this allegation.

and several million dollars in compensatory and punitive damages. (Am. Compl. ¶¶ A–J). He also asks the Court to order that Wexford prescribe him Harvoni. (Id. ¶ E). Burnett obtained representation in May 2016. (ECF No. 6). Approximately one month later, Burnett filed his Motion Requesting Leave to File an Amended Complaint (ECF No. 12).[7] Defendants filed their Motions to Dismiss or, in the alternative, for Summary Judgment (ECF Nos. 14, 15) -- which Burnett opposed (ECF Nos. 17, 18) -- in July 2016.

## II.  DISCUSSION

### A.  Burnett's Motion for Leave to File Amended Complaint

Under Federal Rule of Civil Procedure 15(a), "[t]he court should freely give leave [to amend a complaint] when justice so requires." Fed.R.Civ.P. 15(a)(2). The decision whether to grant leave to amend lies within the sound discretion of the district court. Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W. Va., 985 F.2d 164, 167–68 (4th Cir. 1993). Burnett's proposed changes to his original Complaint are mainly, if not entirely, non-substantive. (See ECF No. 12-2) (depicting changes to original Complaint). Considering the nature of Burnett's changes and Bishop's lack of

---

[7] In his Motion, Burnett states that he received Wexford's consent to file an amended complaint. To date, the Court has no record that Bishop has filed a response in opposition. Also, the Court notes that because Burnett's Amended Complaint was filed by counsel, it is not entitled to liberal construction. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (explaining that pro se pleadings are liberally construed and held to a less stringent standard than pleadings drafted by lawyers).

opposition, the Court will grant Burnett's Motion and consider his Amended Complaint.

When a plaintiff files an amended complaint, it generally moots any pending motions to dismiss because the original complaint is superseded.  See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 456 n.4 (2009) ("Normally, an amended complaint supersedes the original complaint.").  Where "some of the defects raised in the original motion remain in the new pleading, [however,] the court simply may consider the motion as being addressed to the amended pleading.  To hold otherwise would be to exalt form over substance." Buechler v. Your Wine & Spirit Shoppe, Inc., 846 F.Supp.2d 406, 415 (D.Md.2012) (quoting 6 Charles Alan Wright et al., Federal Practice & Procedure § 1476 (3d ed. 2010)). Because all of the defects raised in Defendants' Motions remain in Burnett's Amended Complaint, Defendants' Motions remain operative and the Court will construe them as directed at Burnett's Amended Complaint.

**B.   Defendants' Motions**

### 1.   Standard of Review

Defendants style their Motions as motions to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56.  A motion styled in this manner implicates the Court's discretion under Rule 12(d).   See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd sub nom., Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., 684

F.3d 462 (4th Cir. 2012).  This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56."  Fed.R.Civ.P. 12(d).  The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery.  See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur.  See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005).  The Court "does not have an obligation to notify parties of the obvious."  Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995).

The Fourth Circuit has warned that it "'place[s] great weight on the Rule 56[d] affidavit' and that 'a reference to Rule 56[d] and the need for additional discovery in a memorandum of law in

opposition to a motion for summary judgment is not an adequate substitute for a Rule 56[d] affidavit.'" Harrods, 302 F.3d at 244 (quoting Evans, 80 F.3d at 961). Failing to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Id. (quoting Evans, 80 F.3d at 961). Nevertheless, the Fourth Circuit has indicated that there are some limited instances in which summary judgment may be premature notwithstanding the non-movants' failure to file a Rule 56(d) affidavit. See id. A court may excuse the failure to file a Rule 56(d) affidavit when "fact-intensive issues, such as intent, are involved" and the nonmovant's objections to deciding summary judgment without discovery "serve[] as the functional equivalent of an affidavit." Id. at 245 (quoting First Chicago Int'l v. United Exch. Co., 836 F.2d 1375, 1380–81 (D.C.Cir. 1988)).

Burnett contends that it would be premature to construe Defendants' Motions as ones for summary judgment because he has not had a reasonable opportunity for discovery. To be sure, this case is in its preliminary stages and the Court has yet to enter a scheduling order. See Local Rule 104.4 (D.Md. 2016) (explaining that "discovery shall not commence . . . until a scheduling order is entered"). Because both requirements for conversion are satisfied, however, the Court will deny Burnett's request for discovery and construe Defendants Motions as ones for summary judgment.

The parties were on notice that the Court might resolve Defendants' Motions under Rule 56 because Defendants styled their Motions in the alternative for summary judgment and presented extensive extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464.   Burnett does not express his request for discovery in a Rule 56(d) affidavit; he limits his request to his opposition memoranda.   This alone is reason to deny Burnett's request.   See Harrods, 302 F.3d at 244.   But even if Burnett had sworn his request in a Rule 56(d) affidavit, he does not specify the facts he would seek to discover.   As a result, the Court has no way of determining whether the facts that Burnett would pursue during discovery would by themselves generate a genuine dispute of material fact.   See Strag, 55 F.3d at 953.

What is more, Defendants' principal arguments for why the Court should grant summary judgment are not fact intensive.   One of Bishop's main arguments is that Burnett failed to exhaust administrative remedies.   Burnett does not contend that he exhausted administrative remedies but he is unable to prove that before discovery because Defendants retain control over his requests for administrative relief.   Nor does Burnett assert he seeks to discover facts demonstrating that due to insurmountable obstacles at NBCI, administrative relief was effectively unavailable to him.   Instead, Burnett argues -- with no legal support -- that the Court should countenance Burnett's submission of a request for administrative

remedy filed by a similarly situated inmate during the relevant time period.  (ECF No. 17-1 at 7).  Wexford's primary argument is that its records show that Burnett received constitutionally adequate medical care for his HCV.  Burnett does not challenge the comprehensiveness of Wexford's records; rather, he asserts in a conclusory and boilerplate manner that he "disputes and/or questions the[ir] veracity."  (ECF No. 18-1 at 10).

The Court finds both requirements for conversion are satisfied. The parties were on notice that the Court might construe Defendants' Motions as one for summary judgment and Burnett failed to express his request for discovery in a Rule 56(d) affidavit or specify the fact-intensive issues that would generate a genuine dispute of material fact. Accordingly, the Court will resolve Defendants' Motions under Rule 56.

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute

11

concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.  Anderson, 477 U.S. at 248.  If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 2.   Analysis

In the prison context, the Eighth Amendment encompasses claims that prison personnel failed to protect an inmate from harm or failed to provide medical care.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994) (explaining that under the Eighth Amendment, prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates[.]'" (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984))); see also Helling v. McKinney, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").  Construing Burnett's Amended Complaint in the light most favorable to him, he alleges that Defendants failed to prevent harm to him when they did not ensure that corrections officers were trained in how to properly

12

disinfect nail clippers (the "Failure-To-Train Claim").  Burnett also asserts that Defendants failed to provide medical care when they refused to prescribe Harvoni (the "Medical-Care Claim") and conduct annual tuberculin skin exams (the "Failure-To-Test claim"). Although it is unclear precisely which of Burnett's three claims he asserts against which Defendants, the Court will assume Burnett asserts them against all Defendants.  The Court now turns to Defendants' Motions.

### a.   Warden Bishop's Motion

The Court will grant Warden Bishop's Motion as to the Failure-to-Train and Failure-to-Test Claims because Burnett failed to exhaust administrative remedies.  The Court will also grant Warden Bishop's Motion as the Medical-Care Claim because the record is bereft of any evidence from which a reasonable jury could conclude that Burnett satisfied the elements of supervisory liability.

Warden Bishop argues that the Failure-to-Train and Failure-to-Test Claims are barred because Burnett did not exhaust administrative remedies.  The Prisoner Litigation Reform Act ("PLRA") requires inmates challenging their conditions of confinement to exhaust their administrative remedies before filing suit in court.  It provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted." 42 U.S.C. § 1997e (2012). The PLRA's exhaustion provision requires "prisoners to pursue administrative grievances until they receive a final denial of their claim, appealing through all available stages in the administrative process." Chase v. Peay, 286 F.Supp.2d 523, 530 (D.Md. 2003), aff'd, 98 F.App'x 253 (4th Cir. 2004). A court cannot consider a claim that has not been exhausted. See Jones v. Bock, 549 U.S. 199, 219-20 (2007); see Haskins v. Hawk, No. ELH-11-2000, 2013 WL 1314194, at *8 (D.Md. Mar. 29, 2013) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (quoting Jones, 549 U.S. at 211)).

The Maryland DPSCS has made an "administrative remedy procedure" ("ARP") available to Maryland State prisoners for the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." Md. Code Ann., Corr. Servs. ("CS") § 10-206(a) (West 2017); see generally CS §§ 10-201 et seq.; Md. Code Regs. ("COMAR") 12.07.01.01(B)(1) (2017) (defining ARP). An inmate must exhaust the ARP process as a condition precedent to further review of the inmate's grievance. See CS § 10-206(b); see also COMAR 12.07.01.02.D.

The first step in the ARP process is filing a request for administrative remedy (commonly referred to as an "ARP") with the warden of the prison. See COMAR 12.07.01.04. The ARP must be filed

14

within thirty days of the date on which the incident occurred, or within thirty days of the date the inmate first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.07.01.05A. If the request is denied, a prisoner has thirty calendar days to file an appeal with the Commissioner of Correction. COMAR 12.07.01.05C. If the appeal is denied, the prisoner has thirty days to file a grievance with the Inmate Grievance Office ("IGO"). See CS §§10-206, 10-210; COMAR 12.07.01.03; COMAR 12.07.01.05B.

Warden Bishop's uncontroverted evidence demonstrates that for the Failure-to-Train and Failure-to-Test Claims, Burnett failed to complete even this first step in the ARP process. NBCI's Administrative Remedy Coordinator, Jared Zais, declares that he searched the records of NBCI's Administrative Remedy Office and did not uncover any ARPs from Burnett addressing his Failure-to-Train and Failure-to-Test Claims. (ECF No. 14-3). To be sure, Burnett presents an ARP in which another inmate challenged the alleged failure to train NBCI corrections officers in the proper procedure for disinfecting nail clippers. Burnett maintains that this ARP is sufficient to satisfy this first step in the ARP process because the other inmate is similarly situated. (See ECF No. 17-1 at 7). But Burnett cites no case, and the Court finds none, in which any court held that is permissible to vicariously exhaust administrative remedies through another inmate. And, even assuming that the Court

could credit the ARP filed by another inmate, Jennifer Schmitt, a DPSCS Case Management Supervisor, declares that Burnett did not file ARP appeals challenging any of the subject matter of his Amended Complaint. (ECF No. 14-5).  Accordingly, the Court concludes that based on the undisputed record evidence, Burnett failed to exhaust administrative remedies for his Failure-to-Train and Failure-to-Test Claims.  Thus, the Court will grant Warden Bishop's Motion as to these claims.

Warden Bishop argues that the Court should also enter judgment for him on the Medical-Care Claim because Warden Bishop cannot be liable, as a matter of law, for any alleged deficiencies regarding the medical care Wexford rendered to Burnett.  Indeed, there is no respondeat superior liability under 42 U.S.C. § 1983.  Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004).  Thus, to the extent Burnett seeks to hold Warden Bishop vicariously liable for Wexford's actions in caring for Burnett, his claim fails as a matter of law.

Still, the Fourth Circuit does recognize the doctrine of supervisory liability, under which a supervisor can be liable for the unconstitutional actions or inactions of his subordinates.  See Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001).  Section 1983 claims for failure to provide medical care based on supervisory liability require a showing that the supervisory defendant: (1) "failed promptly to provide an inmate with needed medical care"; (2) "deliberately interfered with the prison doctors' performance"; or

16

(3) "tacitly authorized or [was] indifferent to the prison physicians' constitutional violations." <u>Miltier v. Beorn</u>, 896 F.2d 848, 854 (4th Cir. 1990) (internal citations omitted), <u>overruled in part on other grounds by</u> <u>Farmer</u>, 511 U.S. at 837.

The indifference that is required is "deliberate indifference." See <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain[]' [that is] proscribed by the Eighth Amendment." (internal citation omitted)). A prison official acts with deliberate indifference when he has actual knowledge that an inmate "face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Farmer</u>, 511 U.S. at 847. Constructive knowledge will not suffice -- "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837.

Here, Burnett does not allege that Warden Bishop was personally involved in directing Wexford's decisions regarding his care. Thus, Burnett must show that Warden Bishop deliberately interfered with Wexford's administration of care or was deliberately indifferent to the constitutionally inadequate care they purportedly provided. See <u>Miltier</u>, 896 F.2d at 854. The record, however, is entirely devoid of any facts from which a reasonable jury could find Burnett has

17

made these showings.  The Court, therefore, will grant Warden
Bishop's Motion as to the Medical-Care Claim.

### b.   Wexford's Motion

The Court will enter judgment for Wexford on all three of
Burnett's claims because there is no evidence in the record from
which a reasonable jury could conclude Wexford violated Burnett's
Eighth Amendment rights.

To prevail on an Eighth Amendment claim for denial of medical
care, a prisoner must demonstrate that the action or inaction of
prison staff amounted to deliberate indifference to a serious
medical need.  See Estelle, 429 U.S. at 106.  To prove deliberate
indifference, an inmate must show that he was objectively suffering
from a serious medical need and the prison staff was subjectively
aware of the need, but failed to either provide medical attention or
ensure that it was available.  See Farmer, 511 U.S. at 837.  An
inmate must also show that prison officials acted with a
"sufficiently culpable state of mind."  Jackson v. Sampson, 536
F.App'x 356, 357 (4th Cir. 2013) (quoting De'Lonta v. Angelone, 330
F.3d 630, 634 (4th Cir. 2003)).  Negligence will not suffice.  See
De'Lonta, 330 F.3d at 634.  Rather, a constitutional violation does
not occur unless the medical providers' actions were "so grossly
incompetent, inadequate, or excessive as to shock the conscience or
to be intolerable to fundamental fairness."  Miltier, 896 F.2d at
851.  Conduct rises to this level when a medical provider fails to

deliver the level of care the provider himself believes is necessary. See id. at 853. Furthermore, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (citation omitted); see Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) ("Questions of medical judgment are not subject to judicial review." (citation omitted)).

Burnett does not assert that Wexford failed to provide any care for his HPV. He even acknowledges in his Amended Complaint that Wexford vaccinated him and placed him on antibiotics. (Am. Compl. ¶¶ 16, 18). He also indicates that Wexford offered a liver biopsy, but he refused it because in his opinion, such a procedure is not a "medical prerequisite" to receiving treatment with Harvoni. (Id. ¶ 33). In his opposition memorandum, Burnett reaffirms that he "disputes" that a liver biopsy is a condition precedent to taking Harvoni. (See ECF No. 18-1 at 9).

At bottom, Burnett seeks to compel Wexford to prescribe him Harvoni, and he asserts that Wexford's failure to prescribe this medication constitutes deliberate indifference to his medical needs. The Court finds that Burnett's Medical-Care Claim epitomizes a mere disagreement with medical care -- a claim which is not cognizable under the Eighth Amendment, absent exceptional circumstances. See Wright, 766 F.2d at 849. No exceptional circumstances are present

in this case.  Accordingly, to the extent Burnett challenges Wexford's failure to prescribe Harvoni, the Court will grant Wexford's Motion.

Insofar as Burnett challenges Wexford's actions outside their decision not to prescribe Harvoni, the Court finds as a matter of law that Wexford's actions do not rise to the level of an Eighth Amendment violation. Wexford presents extensive medical records and reports that document the care Burnett received after his HCV diagnosis.  (See ECF No. 15-4).  This documentation shows that Wexford performed an ultrasound on Burnett's abdomen, administered Ultram for pain management, and counseled Burnett regarding the importance of undergoing a liver biopsy if he wanted to pursue antiviral medication as part of his treatment.  (Id. at 17, 23, 40). Burnett originally consented to a liver biopsy, but later refused despite Wexford's encouragement that Burnett undergo the procedure. (Id. at 31, 40–41).

Considering the care that Wexford rendered and Burnett's decision to prevent Wexford from performing what it considered an important step in Burnett's treatment plan, the Court finds as a matter of law that Wexford's actions were not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851.  Thus, to the extent Burnett challenges Wexford's action

unrelated to refusing to prescribe Harvoni, the Court will grant Wexford's Motion.

Finally, the Court will also grant Wexford's Motion as to the Failure-To-Train and Failure-To-Test Claims.  The Court has already concluded that these claims are barred because Burnett failed to exhaust administrative remedies.  Even assuming Burnett had exhausted administrative remedies, the Court would still enter judgment for Wexford on these claims.

In his Complaint, Burnett concedes that NBCI corrections officers -- not Wexford employees -- are responsible for disinfecting and distributing nail clippers.  (See Am. Compl. ¶ 5 at 6). Burnett could only pursue his Failure-To-Claim against Wexford based on a theory of supervisory liability.  But Burnett presents no facts from which a reasonable jury could conclude Wexford -- a private company contracted by the State to provide medical care to inmates (see id. ¶ 8 at 4) -- supervises NBCI corrections officers. See Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (explaining that one factor an inmate must show in pursuing supervisory liability is "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff" (emphasis added) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994))).

As for the Failure-To-Test Claim, Burnett does not allege, much less show, that Wexford's purported failure to conduct annual tuberculin tests caused him any injury, let alone serious injury. See Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993) ("If a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the Amendment.")

### III. CONCLUSION

For the foregoing reasons, the Court will GRANT Burnett's Motion Requesting Leave to File an Amended Complaint (ECF No. 12) and construe Warden Bishop's and Wexford's Motions (ECF Nos. 14, 15) as Motions for Summary Judgment and GRANT them. The Court will also enter JUDGMENT for Defendants on all of Burnett's claims in his Amended Complaint (ECF No. 12 at 2–13) and direct the Clerk to CLOSE this case. A separate Order follows.

Entered this 31st day of January, 2017

                                   /s/
                         _____
                         George L. Russell, III
                         United States District Judge